United States District Court
Southern District of Texas
**ENTERED**
September 02, 2022
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., | § § § | |
| Plaintiff. | § § | |
| | § | CIVIL ACTION NO. 4:20-cv-02913 |
| VS. | § § | |
| M. KATHERINE BANKS, | § § | |
| Defendant. | § | |

### <u>MEMORANDUM AND RECOMMENDATION</u>

In this lawsuit, People for the Ethical Treatment of Animals, Inc. ("PETA") has sued M. Katherine Banks ("President Banks"), in her official capacity as the President of Texas A&M University ("TAMU"), for allegedly violating PETA's freedom of speech under the First Amendment to the United States Constitution.

Presently before me is Defendant's Motion to Dismiss Plaintiff's First Amended Complaint ("Motion to Dismiss"), which argues that this Court lacks subject matter jurisdiction and that PETA fails to state a claim under 28 U.S.C. § 1983. *See* Dkt. 43. PETA has filed a response to the motion, *see* Dkt. 48, President Banks has submitted a reply in support of the motion, *see* Dkt. 49, and PETA has added a sur-reply to the mix. *See* Dkt. 54. To top things off, both parties have filed various "advisories" with the Court. *See* Dkts. 56–57. Suffice it to say, the Motion to Dismiss has been fully briefed. Having reviewed the parties' voluminous briefing and analyzed the applicable legal authorities, I **RECOMMEND** the Motion to Dismiss be **DENIED**.

## BACKGROUND[1]

PETA is a well-known animal-protection advocacy organization. Founded in 1970, PETA utilizes public education, celebrity involvement, and protest campaigns to further its objective of ending the abusive treatment of animals in society.

In 2012, TAMU began breeding dogs with a canine version of muscular dystrophy at a campus laboratory. This research is conducted by TAMU in hopes of finding possible treatments for humans afflicted with muscular dystrophy. According to PETA's First Amended Complaint, the dogs held by TAMU "suffer during painful experiments and procedures and are housed in barren kennels." Dkt. 39 at 16.

Shortly after learning about the TAMU dog laboratory in 2016, PETA began protesting the lab's use of dogs. PETA's advocacy campaign includes frequent posting on TAMU's social media accounts, including the TAMU College of Veterinary Medicine & Biomedical Sciences' ("CVMBS") Facebook page, TAMU's Facebook page, and TAMU's YouTube page.

In late 2017, PETA noticed that content it attempted to post to TAMU's Facebook page failed to appear on TAMU's Facebook page as it had in the past. PETA concluded that TAMU was using an automatic filter setting "to prevent PETA and other critics of TAMU's dog laboratory from posting any information or opinions to the TAMU Facebook Page about their campaign to end canine muscular dystrophy experiments." *Id.* at 17. As a result, PETA brought suit in 2018 against Michael K. Young ("President Young"), in his official capacity as the then-President of TAMU, alleging that TAMU blocked PETA from posting certain

---

[1] This section is taken from the First Amended Complaint for Declaratory and Injunctive Relief ("First Amended Complaint"). *See* Dkt. 39. At this juncture of the case, I am required to accept all well-pleaded allegations as true.

content on TAMU's Facebook page in violation of PETA's rights under the First Amendment. The parties eventually settled the case.

As part of the settlement, President Young agreed that TAMU would not exercise viewpoint discrimination against PETA, its supporters, or members when administering its Facebook page; nor would it set automatic or manual blocking filters on PETA's comments made to TAMU's Facebook page, provided that TAMU could remove comments not in compliance with its Facebook Usage Policy. PETA explicitly retained the right to bring a facial challenge to that policy and to bring an as-applied challenge to the manner that TAMU applies that policy.

In early 2020, the COVID-19 pandemic swept the nation, and group gatherings turned virtual. Like many other universities across the country, TAMU held virtual graduation ceremonies in May 2020 that were livestreamed on its social media platforms, including Facebook and YouTube. In this case, PETA alleges TAMU engaged in viewpoint discrimination by deleting PETA's comments protesting TAMU's dog laboratories from TAMU's Facebook and YouTube livestreams of its graduation ceremonies. According to PETA, 54 of the 80 comments PETA employees and supporters posted on the CVMBS Facebook livestream were deleted, 64 of the 413 comments PETA employees posted to the TAMU Facebook livestream were deleted, and at least 19 of the 70 comments PETA employees and supporters posted on the TAMU YouTube livestream were initially deleted. Deleted comments included:

- "If you care about animals, class of 2020, please be the ones to shut down TAMU's abusive and deadly dog lab."

- "Proud of the grads! Disgraced at the administration for supporting the MD dog laboratory on campus. PETA.org/TAMU."

- "Congrats, graduates. Now please help us in urging TAMU to stop their cruel experiments on animals."

- "I hope the University will recognize that there is no better . . . time than now to do the right thing and release the dogs used for cruel muscular dystrophy experiments to loving adoptive homes."

*Id.* at 19, 21, 23. The TAMU YouTube channel subsequently deleted the entire graduation video, including all comments.

PETA's First Amended Complaint asserts a single cause of action against President Banks for deprivation of its First Amendment rights.[2] As far as remedies are concerned, PETA seeks: (1) a declaratory judgment that TAMU's censoring of PETA's speech—by deleting comments that PETA posts on TAMU's social media pages—is unconstitutional; (2) an injunction requiring TAMU to restore previously deleted comments and prohibiting TAMU from engaging in viewpoint discrimination in the future; and (3) an award of costs and attorney's fees.

Defendants have moved to dismiss the First Amended Complaint. They argue that this case should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and Rule 12(b)(6) for failure to state a claim.

## LEGAL STANDARD

### A.      Rule 12(b)(1)

Rule 12(b)(1) allows a party to challenge the subject matter jurisdiction of the district court to hear a case. *See* FED. R. CIV. P. 12(b)(1). A claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when "the court lacks the statutory or constitutional power to adjudicate the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Miss. Plaintiffs)*, 668 F.3d 281,

---

[2] This lawsuit was originally filed against President Young in his official capacity as President of TAMU. President Young filed a motion to dismiss, which the Court denied as moot to allow PETA an opportunity to file an amended complaint. During the pendency of this case, President Young stepped down from the top post at TAMU. President Banks became TAMU's 26th President, effective June 1, 2021. The First Amended Complaint identifies President Banks as the sole defendant.

286 (5th Cir. 2012) (cleaned up). District courts may dismiss a claim for lack of subject-matter jurisdiction upon consideration of: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Spotts v. United States*, 613 F.3d 559, 566 (5th Cir. 2010) (quotation omitted).

Standing is a jurisdictional question that concerns "the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Article III of the U.S. Constitution limits the power of federal courts to the resolution of "Cases" or "Controversies." U.S. CONST. art. III, § 2. The requirement that a plaintiff establish standing to bring suit "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Every plaintiff in federal court must, therefore, meet the "irreducible constitutional minimum" of Article III standing, which requires: (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury be fairly traceable to the challenged action; and (3) that the injury likely, as opposed to merely speculative, will be redressed by a favorable ruling. *Id.* at 560–61. *See also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). Plaintiffs must satisfy these requirements whether suing as an individual or an organization. *See Vote.org v. Callanen*, 39 F.4th 297, 303 (5th Cir. 2022).

The party asserting federal jurisdiction bears the burden of demonstrating that standing exists. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). In evaluating a Rule 12(b)(1) motion, I accept all well-pleaded factual allegations in the complaint as true, viewing them in the light most favorable to the plaintiff. *See Daniel v. Univ. of Tex. Sw. Med. Ctr.*, 960 F.3d 253, 256 (5th Cir. 2020). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming v. United*

*States*, 281 F.3d 158, 161 (5th Cir. 2001). Where, as here, a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, I must assess the Rule 12(b)(1) jurisdictional issue first. *See id.*

## B.   Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To avoid dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These factual allegations need not be detailed but "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In analyzing a Rule 12(b)(6) motion, I must "accept all well-pleaded facts as true, drawing all reasonable inferences in the nonmoving party's favor." *Benfield v. Magee*, 945 F.3d 333, 336 (5th Cir. 2019). It is also important to highlight that a motion to dismiss under Rule 12(b)(6) is "viewed with disfavor and is rarely granted." *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009) (quotations omitted).

## ANALYSIS

President Banks raises the following eight issues for my review:

1. Whether she has a duty to enforce TAMU's social media policies such that PETA has standing to bring its claims against her and satisfies *Ex parte Young*'s equitable exception;

2. Whether PETA has standing to assert its "posting injury";

3. Whether PETA's "restoration injury" is sufficiently imminent and redressable;

4.  Whether PETA's "reading injury" is justiciable;

5.  Whether PETA has organizational standing;

6.  Whether PETA has associational standing;

7.  Whether PETA has alleged an "ongoing violation" sufficient to bring its claims within *Ex parte Young*'s equitable exception; and

8.  Whether PETA has stated a § 1983 claim.

*See* Dkt. 43 at 12–13. I address each issue in turn.

## A.   ENFORCEMENT CONNECTION

President Banks first argues that PETA fails to plead an enforcement connection between her and the alleged constitutional violations at issue, and that this purported failure speaks to both a lack of standing—specifically, traceability and redressability—and the availability of *Ex parte Young*'s equitable exception. Before addressing these arguments, it is worth reviewing the relevance of *Ex parte Young*, 209 U.S. 123 (1908):

> The Eleventh Amendment bars suits by private citizens against a state in federal court, irrespective of the nature of the relief requested. A plaintiff may not avoid this bar simply by naming an individual state officer as a party in lieu of the State. Yet, few rules are without exceptions, and the exception to this rule allows suits against state officials for the purpose of enjoining the enforcement of an unconstitutional state statute. This exception rests on the fiction of *Ex parte Young*—that because a sovereign state cannot commit an unconstitutional act, a state official enforcing an unconstitutional act is not acting for the sovereign state and therefore is not protected by the Eleventh Amendment.

*Okpalobi v. Foster*, 244 F.3d 405, 411 (5th Cir. 2001) (citation omitted). The fiction of *Ex parte Young* creates an imaginary distinction between the state and its officers. But the exception applies only in equity and only where a plaintiff seeks "prospective relief against a state employee acting in his official capacity." *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 321 (5th Cir. 2008). Moreover, it is not

enough that a plaintiff seeks prospective relief against a state actor in their official capacity:

> For a plaintiff to properly invoke *Ex parte Young*, the state official sued must have some connection with the enforcement of the challenged act, or else the suit is merely making him a party as a representative of the state, and thereby attempting to make the state a party. In other words, there are plenty of state actors. A plaintiff must show that the defendant state actors have the requisite connection to the statutory scheme to remove the Eleventh Amendment barrier to suits brought in federal court against the State.

*Haverkamp v. Linthicum*, 6 F.4th 662, 669 (5th Cir. 2021) (cleaned up). "[T]here is significant overlap between standing and *Ex parte Young*'s applicability." *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 513–14 (5th Cir. 2017).

President Banks argues that PETA "lacks standing as it did not plausibly allege that [she] (1) was involved in the May 2020 deletion incident or (2) had the particular duty to enforce TAMU's social media[] policy." Dkt. 43 at 19. In response, PETA argues that President Banks "'has authority over all TAMU policies and practices,'" Dkt. 48 at 15 (quoting First Amended Complaint at 2), and her predecessor "settled the previous lawsuit on the same issue before this Court." *Id.* at 17.

Despite the inordinate number of pages devoted to this issue, which include a sur-reply, an advisory, and a reply to that advisory, I have no trouble finding that President Banks has a sufficient connection to the enforcement of TAMU's social media policies. All that is required is that PETA allege enough facts that I can plausibly infer an enforcement connection. *See Haverkamp*, 6 F.4th at 671. It is undisputed that President Young, TAMU's previous President, executed a settlement agreement, in his official capacity, regarding the enforcement of TAMU's social media policies against PETA. *See* Dkt. 16-1. This action makes it entirely plausible that President Banks, as President Young's successor, has at least

8

"some connection" to the challenged behavior in this litigation. *Air Evac EMS*, 851 F.3d at 517. That is all that is required of this "straightforward inquiry." *Id.* at 516. Yet in President Banks's *three* bites at this apple—her Motion to Dismiss, her reply in support of her Motion to Dismiss, and an advisory—she never once mentions the settlement agreement or addresses its effect on this analysis. Instead, President Banks focuses exclusively on why her general authority is insufficient to infer an enforcement connection. *See* Dkt. 43 at 20; Dkt. 49 at 2–3; Dkt. 56. But whether President Banks is the appropriate party based on her general authority is not an issue I need to decide when her predecessor agreed, on TAMU's behalf, "[t]o not exercise viewpoint discrimination when administering its Facebook page, and in particular to not exercise viewpoint discrimination against PETA or PETA's supporters or members." Dkt. 16–1 at 3.

Interestingly, none of the *many* cases cited by President Banks involve universities. Indeed, my research indicates that this issue is often not raised even when state universities challenge a plaintiff's standing to sue a university's president (or equivalent title) in their official capacity. Instead, defendants usually raise the issue of whether plaintiffs have alleged an ongoing violation[3]—a topic I

---

[3] *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 338 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (holding that organization advocating for First Amendment free speech rights had standing to bring action for preliminary injunction against university president in action challenging university's policies concerning speech on its campus); *Nelson*, 535 at 322 (finding a claim for employment reinstatement against university president in his official capacity cognizable under *Ex parte Young*); *Bd. of Trs. of Ark. A&M Coll. v. Davis*, 396 F.2d 730, 734 (8th Cir. 1968) (holding suit by teacher against trustees and president for dismissing him for constitutionally protected activities not barred by Eleventh Amendment); *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, --- F. Supp. 3d ---, No. 4:20-CV-973-SDJ, 2022 WL 1063876, at *7 (E.D. Tex. Apr. 8, 2022) (finding university's president had "sufficient connection to the enforcement of challenged tuition rates"); *KaZee, Inc. v. Callender*, No. 4:19-CV-31-SDJ, 2020 WL 994832, at *6 (E.D. Tex. Mar. 2, 2020) (collecting cases and finding the Eleventh Amendment did not bar plaintiff's suit against university officials, including the president, for claims of copyright infringement and misappropriation of trade secrets).

discuss in Section E of this Memorandum and Recommendation. The idea that a university's head is an appropriate party for challenging the university's actions seems so unobjectionable in a variety of contexts that I have not located cases holding otherwise, and President Banks certainly has not pointed me toward any. Nevertheless, my holding hinges not on President Banks's general authority as TAMU's President but on the express obligation that her predecessor undertook with respect to TAMU's enforcement of its social media policies against PETA. *See* Dkt. 16-1. Thus, I recommend the Motion to Dismiss be denied to the extent President Banks argues that PETA fails to allege an enforcement connection sufficient to establish standing or to bring its claims within *Ex parte Young*'s equitable exception.

## B.   PETA'S "POSTING INJURY"

President Banks next claims that PETA's "posting injury"—PETA's interest in posting future comments on TAMU's social media pages—is nonjusticiable because PETA did not allege: "(1) an objectively reasonable chilling injury due to the May 2020 incident; (2) a serious intent, backed by concrete plans, to post protest comments on TAMU's social media sites in the imminent future; and (3) that it faces a credible threat of prosecution under TAMU's social media policy." Dkt. 43 at 21. The parties seem to agree that the relevant test is the one articulated in *Susan B. Anthony List v. Driehaus*, in which the Supreme Court held that for threatened enforcement of a law to create an Article III injury, the plaintiff must allege: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that the "intended future conduct is arguably proscribed by the statute"; and (3) that "the threat of future enforcement is substantial." 573 U.S. 149, 161–64 (2014) (cleaned up). For the reasons explained below, I find that application of the *Driehaus* test results in Article III injury.

But first, I must pause to address the additional requirement that President Banks would have me superimpose onto *Driehaus*. President Banks argues that

"[f]or *Driehaus*'s test to apply, there must be a legally cognizable injury," which she argues "is most often (if not exclusively) a chilling injury." Dkt. 43 at 22. President Banks notably does not cite *Driehaus* in support of this "chilling injury" requirement. Indeed, *Driehaus* imposes no such requirement because a plaintiff who sufficiently pleads each part of *Driehaus*'s test *establishes* an Article III injury. *See Driehaus*, 573 U.S. at 168. It makes no sense to require a plaintiff to allege injury on top of injury, and I will not do so here. Setting aside the superfluous argument that PETA must also allege a chilling injury for *Driehaus*'s test to apply,[4] I find that PETA easily satisfies *Driehaus*'s test to establish an Article III injury in fact.

PETA alleges that it "wishes to continue posting comments" about TAMU's research on its Facebook pages and YouTube channel (*see* Dkt. 39 at 20, 22–23), a course of conduct indisputably affected with a constitutional interest in free speech. Yet President Banks argues this allegation is insufficient because "PETA did not identify any 'concrete plans' or other evidence of its 'serious intent' to post protest comments on TAMU's social media sites in the imminent future." Dkt. 43 at 24. This argument discounts the serious intent evidenced by PETA's past

---

[4] In support of this argument, President Banks relies on a host of inapposite cases concerning plaintiffs who had yet to be injured and defendants who had taken no action at any time. *See* Dkt. 43 at 22. Each of those cases is inapplicable to a case like this where PETA has already taken the concrete act of speaking, and TAMU has already taken action to counter PETA's speech. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–16 (2013) (finding respondents' fears of being targeted by government surveillance too speculative to establish an impending or traceable injury); *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) (holding that respondents lacked standing to challenge the Army's data-gathering system because their alleged chilling injury was subjective); *Glass v. Paxton*, 900 F.3d 233, 240 (5th Cir. 2018) (finding that professor's decision to self-censor rested on speculation about "hypothetical future decisions of students in her classroom"); *Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 610 (6th Cir. 2008) (finding that plaintiff's allegations constituted no more than impermissibly subjective chilling "[a]bsent a concrete act on the part of [defendants]").

campaigns and litigation. Moreover, every case President Banks cites in support of her argument that PETA must identify "concrete plans" is easily distinguishable.

For example, take *Mississippi State Democratic Party v. Barbour*, 529 F.3d 538 (5th Cir. 2008), a lawsuit seeking to overturn as unconstitutional Mississippi's semi-closed primary statute.[5] In that case, the Fifth Circuit held that the Democratic Party did not have standing because it had no intent to hold closed primaries in violation of Mississippi law. In reaching this conclusion, the Fifth Circuit noted that the Democratic Party had "taken no steps internally to limit participation in its primaries to members of the Democratic Party," *id.* at 544, and had never "adopted any policies to exclude voters not registered as Democrats from its primary." *Id.* at 545. Similarly, in *Zimmerman v. City of Austin*, the plaintiff, who challenged a campaign-finance law, "did not take steps towards reaching or exceeding the aggregate limit [on campaign contributions] that would demonstrate a serious intent to violate the statute." 881 F.3d 378, 389 (5th Cir. 2018).

Here, PETA previously sued TAMU's President for discriminating against its speech, and PETA undertook that same speech after settling the first litigation. Accordingly, like the plaintiffs in *Justice v. Hosemann*, PETA's "past enthusiastic participation" in protesting TAMU's muscular dystrophy research "indicates that [it] would have [continued its advocacy]." 771 F.3d 285, 291 (5th Cir. 2014). PETA's actions to date therefore provide ample "objective evidence to demonstrate a 'serious intent'" to engage in such speech in the future. *Barbour*, 529 F.3d at 546.

Nevertheless, President Banks argues that because "a violation of TAMU's social media policy carries no risk of criminal prosecution, civil penalty, or other

---

[5] "[A] 'semi-closed' primary . . . allows voters to affiliate with the party at the time of the primary, rather than an 'open' primary where any voter can vote for any candidate, or a closed primary where the voter must be registered as a member of the party for some period of time prior to the primary election." *Barbour*, 529 F.3d at 541 n.1.

serious sanction," PETA should be "posting comments on TAMU's social media sites and waiting to see if those comments get deleted." Dkt. 49 at 5. The only case President Banks cites in support of this argument is *Lujan*. *See* 504 U.S. 555. Notably, *Lujan* addressed whether plaintiffs had adduced sufficient evidence to support standing at the summary judgment stage, not on a motion to dismiss. *See id.* at 561. Indeed, the Court in *Lujan* observed that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.*

More importantly, playing President Banks's argument out to its logical conclusion shows how misguided it is. Were PETA to repost its original comments to TAMU's social media sites and TAMU to delete them again, PETA would have the same standing it does now. But if—as is much more likely to occur given that litigation is ongoing—PETA were to repost its original comments to TAMU's social media sites and TAMU did *not* delete them, I would nevertheless find that PETA has standing. As the Supreme Court has repeatedly held:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power.

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). *Only* "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" would the court be without jurisdiction to hear this dispute. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted). Therefore, it would be futile to require PETA to engage in additional speech.

Here, statements in the Motion to Dismiss and supporting declarations make it reasonable to expect that TAMU will attack PETA's speech again. *See* Dkt.

43 at 14 (characterizing PETA's comments as "spam"); Dkt. 43-1 at 2 (characterizing PETA's comments as "spam" and as violations of TAMU's social media policy). Whether TAMU's enforcement of its social media policies comports with the First Amendment and whether it was constitutionally permissible to delete PETA's comments is not for me to decide at this juncture. Right now, all I must ask is whether PETA has alleged an Article III injury such that it would be proper for this court to exercise its jurisdiction. The answer to that question is yes. As a result, the Motion to Dismiss should be denied to the extent President Banks argues that PETA's "posting injury" is nonjusticiable.

## C.   PETA'S "RESTORATION INJURY"

President Banks also claims that PETA lacks standing to assert its "restoration injury"—TAMU's failure to restore all the comments it deleted—because the restoration injury is neither redressable nor imminent.

Before I reach either of these arguments, I must address some objections. In support of its argument that PETA's restoration injury cannot be redressed, President Banks attaches declarations from TAMU's Director of Social Media and its Director of Communications for CVMBS, which provide that TAMU "does not have the power to restore" these deleted comments. *See* Dkt. 43-1 at 3 and Dkt. 43-2 at 3. PETA argues that I should ignore these declarations at the motion to dismiss stage. *See* Dkt. 48 at 24 n.3. PETA also counters that "the specifics of [restoration] need not be decided at this stage of the litigation" but asserts that "PETA retains records of comments deleted but not restored, and they could be posted somewhere on TAMU's YouTube and Facebook public forums to redress PETA's injury." *Id.* at 24. President Banks replies that this assertion is "not alleged in PETA's First Amended Complaint or supported by a proper declaration," and therefore these facts are not properly before me. Dkt. 49 at 8 n.38.

Because arguments about redressability go to standing, it is appropriate for me to consider the declarations. *See Williamson*, 645 F.2d at 413 ("the trial court

is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case") (quotation omitted). I also agree with President Banks that PETA's statements about retaining the deleted comments are not properly before me. However, whether PETA retains the deleted comments is not critical to my recommendation regarding redressability. With these evidentiary matters behind me, I turn to President Banks's arguments that PETA's restoration injury is not redressable.

Redressability merely requires "a likelihood that the injury will be redressed by a favorable decision, . . . mean[ing] that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663–64, (1993) (quotation omitted). Of redressability, the Supreme Court has said that "it is not necessary to decide whether [the] alleged cause of action . . . is in fact a cause of action on which [the plaintiff] could actually recover. Instead, the test is whether the cause of action alleged is so patently without merit as to justify the court's dismissal for want of jurisdiction." *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 70, (1978) (cleaned up). This minimal test is easily satisfied here for all the reasons discussed throughout. I agree with PETA that the redressability inquiry does not require me to sort out the particulars of injunctive relief--an issue not before this Court on this motion and over which the parties will undoubtedly supply ample briefing. All I must decide is whether President Banks is the appropriate party against whom injunctive relief should be directed, and I have already answered that question in the affirmative.

President Banks also argues that PETA's restoration injury is not sufficiently imminent because it is premised on "three contingencies: (1) individuals will watch TAMU's over 500-day-old videos; (2) these viewers will read the comments posted to the videos; and (3) these viewers would have seen PETA's deleted comments (if they were restored) while missing PETA's many other non-deleted comments."

Dkt. 43 at 27. The only case President Banks cites in support of this metaphysical argument is *Glass*, 900 F.3d 233, a case as inapposite in this context as it was in the context of PETA's posting injury. *See supra* note 4. PETA's restoration injury does not require the realization of these contingencies. Just as a falling tree produces vibrational waves in the air, viewpoint discrimination offends the Constitution regardless of whether anyone is in the hypothetical forest to hear (or, in this case, read) it. Phrased differently, it does not matter whether anyone wants to read PETA's comments; PETA has a right to put them in TAMU's public forum. *See, e.g.*, *Knight First Amend. Inst. at Colum. Univ. v. Trump*, 928 F.3d 226, 238 (2d Cir. 2019), *cert. granted, judgment vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Colum. Univ.*, 141 S. Ct. 1220 (2021). I thus recommend that the Motion to Dismiss be denied to the extent President Banks argues that PETA's restoration injury is neither redressable nor imminent.

## D.    PETA's "Reading Injury"

President Banks argues that PETA's "reading injury"—its inability to read comments posted by others—is nonjusticiable because "PETA did not allege a single instance where TAMU deleted protest comments [made by others]," and "PETA would seemingly need to have third-party standing," which she argues it does not. Dkt. 43 at 27. The first argument is belied by PETA's First Amended Complaint, which clearly states that TAMU deleted supporters' comments in addition to deleting PETA's employees' comments. *See* Dkt. 39 at 18-19, 23. President Banks wisely drops the second argument in her reply,[6] pivoting instead to the argument that PETA has not alleged a "willing speaker." Dkt. 49 at 7 n.36. But this argument is also unavailing as PETA has alleged that its "supporters[] wish[] to continue posting comments about TAMU laboratories." Dkt. 39 at 20.

---

[6] *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas.").

Perhaps in recognition of this fact, President Banks argues further that PETA "did not plausibly explain: (1) who would post the comments; (2) where the comments would be posted; (3) what message the comments would contain; (4) when the comments would be posted; and (5) why it believes the comments are at imminent risk of being blocked." Dkt. 49 at 7–8. This is not a fraud case. PETA does not have to satisfy any heightened pleading requirements. PETA need only allege "a short and plain statement of the claim showing that [it] is entitled to relief." FED. R. CIV. P. 8(a)(2). PETA has done that here. No more is required. Thus, I recommend the Motion to Dismiss be denied to the extent President Banks argues that PETA's reading injury is nonjusticiable.

## E.   ORGANIZATIONAL STANDING

Next, President Banks contends that PETA cannot assert organizational standing because it does not satisfy Article III's standing requirements. But I have already determined that it does. *See supra* §§ A–D. That ought to be the end of the standing inquiry. However, President Banks argues that "to assert organizational standing, PETA must show that TAMU's conduct 'perceptibly impaired' its mission." Dkt. 43 at 28. Phrased differently, President Banks argues that it is not enough that PETA alleged a violation of its First Amendment right to free speech; PETA must also allege that the violation of its free speech rights perceptibly impaired its mission. This is obviously wrong. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784 (1978) (finding "no support in the First or Fourteenth Amendment, or in the decisions of this Court, for the proposition that speech that otherwise would be within the protection of the First Amendment loses that protection simply because its source is a corporation that cannot prove, to the satisfaction of a court, a material effect on its business or property"). Tellingly, none of the cases President Banks cites in support of this argument are cases

regarding constitutional violations. *See* Dkt. 43 at 28 n.103.[7] The Constitution does not require this much. PETA "has alleged violations of its First Amendment . . . rights and thereby satisfied the irreparable injury requirement." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 296 (5th Cir. 2012). *See also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Thus, I recommend the Motion to Dismiss be denied to the extent President Banks asserts that PETA lacks organizational standing.

## F.   ASSOCIATIONAL STANDING

President Banks asserts that PETA has not alleged facts that would confer associational standing. *See* Dkt. 43 at 28–29. In response, PETA disclaims that it is asserting associational standing on behalf of its members. *See* Dkt. 48 at 22 n.2. Accordingly, this portion of the Motion to Dismiss should be denied as moot.

## G.   EX PARTE YOUNG—ONGOING VIOLATION

President Banks argues that because "PETA's requests for declaratory and injunctive relief involve *past* conduct," PETA is "not entitled to the *Ex parte Young* exception as it did not plausibly allege an ongoing violation of federal law." Dkt. 43 at 30. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the First Amended Complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (cleaned up). President Banks

---

[7] *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (determining whether plaintiff had standing under the Fair Housing Act); *Tenth St. Residential Ass'n v. City of Dall.*, 968 F.3d 492, 500 (5th Cir. 2020) (same); *NAACP. v. City of Kyle*, 626 F.3d 233, 238–39 (5th Cir. 2010) (same); *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 23–24 (D.C. Cir. 2015) (finding plaintiff's argument—that FERC's refusal to license two projects in a single proceeding would result in a decline to the fish population and thus reduce the number of tourists who come to observe salmon spawn, leading to a reduction in plaintiff's income—insufficient to constitute a constitutional injury).

18

avers that the "fact that a small portion of deleted comments are not available to future view[er]s is a consequence of a past violation, not an ongoing violation itself." Dkt. 43 at 32. To the extent that PETA seeks a declaratory judgment regarding TAMU's deletion of its comments, I agree that such a request is not permissible under *Ex parte Young*.

However, President Banks overlooks that, by TAMU's own admission, the comments were deleted because they "violated TAMU's Social Media Policy." Dkt. 43-1 at 2. That policy is ongoing, and PETA challenges its continued enforcement. *See* Dkt. 39 at 20, 22-23 (challenging TAMU's "enforcement of its current social media policies"). The challenge to TAMU's continued enforcement of its current social media policies against PETA—an act that PETA has plausibly alleged is reasonably likely to recur (*see supra* at 11-13)—is enough for this straightforward inquiry. *See, e.g.*, *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 425 (5th Cir. 2020) (holding that plaintiff had established an ongoing violation where defendants had not retracted their previous statements indicating that future applications to display a secular nativity scene at the Capitol would be denied).

Throughout her briefing, President Banks argues that PETA's failure to bring a facial challenge to TAMU's social media policies is fatal. But in *Freedom From Religion Foundation*—another remarkably on-point case cited by PETA that President Banks chose not to address in her reply—the Fifth Circuit found that a non-profit organization's request for "a declaration 'that the criteria to approve exhibits for display in the State Capitol, facially and/or *as applied* by the Defendants, *violate*' the First Amendment and an injunction preventing 'the Defendants from excluding the Plaintiff's exhibit at issue *from future display*'" established an ongoing violation of federal law. *Id.* at 424 (first emphasis added). The Fifth Circuit's analysis did not turn on the nature of the challenge. Rather, as here, the state officials' own statement, beyond the policy itself, "established the ongoing nature of the violation." *Id.* at 425. The state officials told the non-profit

organization they would continue to deny its applications to display a secular "Bill of Rights nativity exhibit" at the Capitol. *Id*. at 423. Their statement was rooted in how they interpreted "public purpose"—specifically, whether the nativity exhibit promoted a public purpose. *See id*. In other words, the state officials created an ongoing basis for an as-applied challenge. Here, President Banks has made clear that TAMU considers PETA's comments violative of its policies. *See* Dkt. 43 at 10–11, 13–14, 25; Dkt. 43-1 at 2; Dkt. 43-2 2. These statements only serve to bolster PETA's allegations that TAMU's enforcement of its policies *continues* to hamper PETA's advocacy campaigns. *See* Dkt. 39 at 20, 22-23. Accordingly, PETA has alleged an ongoing violation.

Finally, President Banks asserts that PETA's request for prospective injunctive relief to restore the deleted comments is also nonjusticiable because it is neither redressable nor imminent. *See* Dkt. 43 at 31. I have already dispensed with these arguments. *See supra* § C. Thus, I recommend the Motion to Dismiss be denied to the extent President Banks argues that PETA has not alleged an ongoing violation sufficient to bring its claims within *Ex parte Young*'s exception.

## H.   PETA'S § 1983 CLAIM

Section 1983 provides a cause of action—both in law and equity—for the redress of civil rights violations against government officials. *See* 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "[I]n a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). State officials can be sued in either their individual or their official capacities. "[T]o prevail in an official-capacity action, a plaintiff generally must show that a policy or custom of the governmental

entity played a part in the violation of federal law." *Shisinday v. Johnson*, 234 F.3d 28, 2000 WL 1568146, at *3 (5th Cir. 2000). As discussed above, in official-capacity suits—in which the state is the real party in interest—the Eleventh Amendment and *Ex parte Young* make it so that "only prospective equitable relief is available." *Id.* Nevertheless, "the substantive protections of the Eleventh Amendment do not prevent an award of attorney's fees against [state] officers in their official capacities." *Hutto v. Finney*, 437 U.S. 678, 692 (1978). Therefore, a prevailing party in a § 1983 action for prospective relief against a state may be able to request reasonable attorney's fees. *See* 42 U.S.C. § 1988(b).

President Banks does not dispute that PETA has alleged the requisite violation of its constitutional rights or that she is a person acting under color of state law. Rather, she argues that PETA fails to state a § 1983 claim because it did not "plausibly allege that a TAMU policy or custom was the moving force behind its First Amendment deprivation." Dkt. 43 at 32. President Banks argues further that because "PETA did not claim that this policy is itself unconstitutional[,] . . . PETA must show that TAMU's policymakers were 'deliberately indifferent' towards PETA's constitutional rights." *Id.* at 33–34. In support of this argument, President Banks cites *Gonzalez v. Ysleta Independent School District*, 996 F.2d 745 (5th Cir. 1993).

*Gonzalez* is a tragic case brought by the parents of a young girl who was sexually abused by her teacher. *See id.* at 750. In *Gonzalez*, the Fifth Circuit reiterated that, under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), "local governments are responsible for constitutional wrongs visited upon citizens pursuant to official 'policy.'" *Gonzalez*, 996 F.2d at 753. "The Gonzalezes prevailed at trial on the theory that the [district's] Board of Trustees' decision to transfer [the offending teacher] to their daughter's school was a proximate cause of [her] injury." *Id.* Notably, the decision to transfer the teacher was "contrary to the district's own formal policies." *Id.* Yet the Fifth Circuit rejected

the notion "that an ad hoc, isolated decision" cannot "constitute the sort of 'policy' upon which . . . liability may be predicated." *Id.* Rather, the Fifth Circuit reversed because "a single, aberrant decision" will not establish liability "unless the decisionmaker was at a minimum deliberately indifferent to its likely consequences." *Id.* Hence the rule cited by President Banks—that where "a policy in some sense causes, but does not compel, a constitutional violation, plaintiffs must establish that the particular harm-producing deficiency resulted from conscious choice"—derives from a highly attenuated proximate causation context. *Id.* at 755 (quotation omitted).

*Gonzalez* is inapplicable. By President Banks's own admission, PETA's comments were deleted because they "violated TAMU's social media policy." Dkt. 43 at 14. Were there any lingering doubt that PETA's comments were deleted because of TAMU's social media policies, I need only look to the declaration of TAMU's Director of Social Media, who characterizes PETA's posts as "spam messages" that "violate[] TAMU's Social Media Policy." Dkt. 43-1 at 2. Accordingly, proximate cause is not so attenuated that PETA must establish deliberate indifference.

PETA does not address *Gonzalez* or deliberate indifference, but retorts that President Banks's characterization of PETA's viewpoint as "spam" is itself "an official policy of viewpoint discrimination." Dkt. 48 at 28 (quoting *Robinson v. Hunt Cnty.*, 921 F.3d 440, 449 (5th Cir. 2019)). *Robinson* is a First Amendment case in which Robinson "pleaded an official policy of viewpoint discrimination on the [Hunt County Sheriff's Office ("HCSO")] Facebook page." *Robinson*, 921 F.3d at 449. The policy in question was a message posted by the HCSO account, which warned, in relevant part, "comments that are considered inappropriate will be removed." *Id.* The Fifth Circuit had no trouble finding this allegation "sufficient to state a claim that HCSO's policy was the 'moving force' behind the violation of

Robinson's constitutional rights." *Id.* Indeed, the Fifth Circuit noted that "a policy of deleting 'inappropriate' comments is viewpoint discriminatory." *Id.*

President Banks does not address *Robinson*'s applicability to whether PETA states a § 1983 claim. Instead, President Banks discusses *Robinson* only in the context of standing. *See* Dkt. 49 at 6. Yet *Robinson* clearly applies here. In *Robinson*, no discussion of deliberate indifference was necessary. HCSO deleted the plaintiff's comments because it considered them inappropriate under HCSO's policy. Similarly, TAMU deleted PETA's comments because it considers them violations of its social media policies. Accordingly, I recommend the Motion to Dismiss be denied to the extent President Banks argues that PETA fails to state a § 1983 claim.

## CONCLUSION

For all the reasons explained above, I recommend the Motion to Dismiss (*see* Dkt. 43) be **DENIED**. Specifically, I recommend the district court find that it has subject matter jurisdiction to hear PETA's claims—both because PETA has standing to assert its injuries and because its claims fall within with *Ex parte Young*'s equitable exception—and that PETA has sufficiently stated a § 1983 claim at this early stage in the case.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections under Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED this 2nd day of September 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE