# UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

PEOPLE FOR THE ETHICAL TREATMENT
OF ANIMALS, INC.,

     **Plaintiff,**

   **v.**

M. KATHERINE BANKS,

     **Defendant.**

Civil Action No. 4:20-cv-02913

## PLAINTIFF'S RESPONSE TO DEFENDANT'S OBJECTIONS

CHRISTOPHER W. ROTHFELDER
Texas State Bar No. 2408470
Southern District I.D. 2449594
crothfelder@rothfelderfalick.com
Rothfelder & Falick, L.L.P.
1201 Louisiana St., Suite 550
Houston, TX 77002
713.220.2288 telephone

MUKUND RATHI*
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
415.436.9333 telephone
415.436.9993 facsimile
mukund@eff.org

* admitted *pro hac vice*

*Attorneys for Plaintiff People for the Ethical Treatment of Animals, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES .................................................................................. iii

INTRODUCTION .................................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 2

ARGUMENT .......................................................................................................... 4

    I.    The president of TAMU is a proper defendant under *Ex parte Young*, and PETA's injury is traceable to her. .......................................................... 4

        a.    The settlement conceded the President's enforcement connection to social media censorship. ..................................................................... 4

        b.    TAMU's president has comprehensive authority on campus. ............... 5

        c.    TAMU's president handles high-profile issues like censoring PETA. ..... 6

    II.    PETA sufficiently alleges that it intends to continue campaigning against TAMU's experiments on dogs. ............................................................... 7

    III.    PETA sufficiently alleges a credible threat that TAMU will continue its censorship. ...................................................................................... 10

        a.    PETA sufficiently alleges that TAMU unlawfully censored its speech. ........................................................................................ 10

        b.    PETA sufficiently alleges that TAMU will continue to unlawfully censor its speech. ........................................................................... 13

    IV.    PETA sufficiently alleges that TAMU's failure to restore the comments of PETA and its supporters causes it injury-in-fact. ........................... 16

    V.    PETA sufficiently alleges that a prospective injunction would likely redress its injuries. ........................................................................................ 17

    VI.    PETA sufficiently alleges injury from TAMU's censorship of others that PETA wants to hear. ............................................................................ 18

    VII.    PETA need not allege its mission was perceptibly impaired. ................ 18

VIII.  PETA states a valid claim under Section 1983...................................................19

CONCLUSION .........................................................................................................21

CERTIFICATE OF SERVICE .................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Evac EMS v. Tex. Dep't of Ins.*,
  851 F.3d 507 (5th Cir. 2017) ................................................................. 4, 5

*Babbitt v. Farm Workers*,
  442 U.S. 289 (1979) ......................................................................... 7, 13

*Barilla v. City of Houston*,
  13 F.4th 427 (5th Cir. 2021) ................................................................. 14

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ................................................................. 7, 10, 15, 16

*Davison v. Randall*,
  219 F.3d 666 (4th Cir. 2019) ................................................................. 15

*Deal v. Mercer Cnty. Bd. of Educ.*,
  911 F.3d 183 (4th Cir. 2018) ................................................................. 16

*Elend v. Basham*,
  471 F.3d 1199 (11th Cir. 2006) ............................................................... 8

*Elrod v. Burns*,
  427 U.S. 347 (1976) ............................................................................ 19

*Ex parte Young*,
  209 U.S. 123 (1908) ................................................................. 4, 5, 16, 21

*Firefighters' Ret. Sys. v. EisnerAmper, L.L.P.*,
  898 F.3d 553 (5th Cir. 2018) ................................................................. 12

*First Nat'l Bank v. Bellotti*,
  435 U.S. 765 (1978) ............................................................................ 19

*Garnier v. O'Connor-Ratcliff*,
  41 F.4th 1158 (9th Cir. 2022) ................................................................ 12

*Gonzalez v. Ysleta Indep. Sch. Dist.*,
  996 F.2d 745 (5th Cir. 1993) ................................................................. 20

*Green Valley Special Util. Dist. v. City of Schertz*,
  969 F.3d 460 (5th Cir. 2020) ................................................................. 21

*Haverkamp v. Linthicum,*
    6 F.4th 662 (5th Cir. 2021) ......................................................................... 5

*Hernandez v. Cremer,*
    913 F.2d 230 (5th Cir. 1990) ..................................................................... 15

*In re Bluewater Network*,
    234 F.3d 1305 (D.C. Cir. 2000) ................................................................ 17

*James v. Tex. Collin Cty.*,
    535 F.3d 365 (5th Cir. 2008) ..................................................................... 19

*Justice v. Hosemann,*
    771 F.3d 285 (5th Cir. 2014) ................................................................... 7, 9

*K.P. v. LeBlanc,*
    627 F.3d 115 (5th Cir. 2010) ....................................................................... 4

*Kentucky v. Graham,*
    473 U.S. 159 (1985) ................................................................................... 20

*Lynch v. Leis,*
    382 F.3d 642 (6th Cir. 2004) ..................................................................... 15

*Machete Prods. v. Page,*
    809 F.3d 281 (5th Cir. 2015) ....................................................................... 8

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ................................................................................... 17

*McCutcheon v. FEC,*
    572 U.S. 185 (2014) ................................................................................... 16

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978) ................................................................................... 20

*Morris v. Livingston,*
    739 F.3d 740 (5th Cir. 2014) ....................................................................... 6

*Nat'l Parks Cons. Ass'n v. TVA,*
    480 F.3d 410 (6th Cir. 2007) ..................................................................... 17

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*
    508 U.S. 656 (1993) ................................................................................... 18

*Nelson v. Univ. of Tex.*,
   535 F.3d 318  (5th Cir. 2008) ................................................................ 5

*NiGen Biotech, L.L.C. v. Paxton*,
   804 F.3d 389 (5th Cir. 2015) .............................................................. 17

*Prison Legal News v. Livingston*,
   683 F.3d 201 (5th Cir. 2012) .............................................................. 19

*Richardson v. Flores*,
   No. 20-50774, 2022 WL 795859 (5th Cir. Mar. 16, 2022) ........................... 5

*Robinson v. Hunt Cnty.*,
   921 F.3d 440 (5th Cir. 2019) ................................................... 11, 13, 20

*Shisinday v. Johnson*,
   234 F.3d 28, 2000 WL 1568146 (5th Cir. 2000) ..................................... 20

*Soc'y of Separationists v. Herman*,
   959 F.2d 1283 (5th Cir. 1992) ............................................................ 15

*Spec's Family Partners, Ltd. v. Nettles*,
   972 F.3d 671 (5th Cir. 2020) .............................................................. 17

*Speech First v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) ....................................................... 13, 14

*Stanley v. Georgia*,
   394 U.S. 557 (1969)................................................................... 16, 18

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)............................................................................ 17

*Steffel v. Thompson*,
   415 U.S. 452 (1974)......................................................................... 14

*Stratta v. Roe*,
   961 F.3d 340 (5th Cir. 2020) .............................................................. 11

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)........................................................................... 7

*Tex. Democratic Party v. Abbott*,
   978 F.3d 168 (5th Cir. 2020) ................................................................ 6

---

*Turlock Irr. Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ........................................................................ 19

*Williams ex rel. J.E. v. Reeves*,
  954 F.3d 729 (5th Cir. 2020) ...................................................................... 16

*Zimmerman v. City of Austin*,
  881 F.3d 378 (5th Cir. 2018) ........................................................................ 9

**Statutes**

42 U.S.C. § 1983 ................................................................... 19, 20, 21

## INTRODUCTION

PETA returns to court just three years after favorably settling an earlier First Amendment case against Texas A&M University (TAMU), to once again challenge TAMU's unconstitutional censorship. *See* Docket no. 16, Ex. A (Settlement Agreement).

PETA is in the middle of a years-long campaign to end the torment of golden retrievers and other dogs whom TAMU intentionally bred to suffer severe muscular dystrophy. First Am. Compl. (FAC) ¶¶ 48-50. These dogs struggle to walk and eat, and drool compulsively as their jaw muscles atrophy. *Id.* ¶ 48 n.21. PETA attempted to speak to the TAMU graduates and wider community about the dog lab in the online public forums that TAMU created for its May 2020 graduation ceremony livestreams. *Id.* ¶¶ 60-62, 69-70, 79. In forums with thousands of comments and hundreds of thousands of views, TAMU deleted one out of every four of PETA's comments. *Id.* PETA's comments clearly related to these "life-defining event[s]." Def. Mot. to Dismiss (MTD) at 1. Many expressed pride in the graduates and hope that, as the "the graduating students" went forward into their new lives, they would do things like embrace "humane and effective non-animal research methods" and help end TAMU's dog experiments. *Id.* ¶¶ 61-63, 70-71, 79.

TAMU deleted these comments a mere six months after TAMU's president settled PETA's previous First Amendment lawsuit and agreed to not block, filter, or discriminate against PETA on social media. *See* Settlement Agreement. And far from disavowing this censorship, TAMU's president continues to disparage PETA's viewpoint about how TAMU graduates should relate to their alma mater as "spam" not entitled to First Amendment protection. Defendant's Objections (Obj.) at 17; Report and Recommendation

---

(R&R) at 13 (collecting TAMU's "spam" characterizations). Clearly, TAMU will not follow the law without further intervention by this Court.

TAMU's president has raised eight objections to the excellent opinion by Magistrate Judge Edison, Obj. at 1-3, 19, and PETA rebuts them each in turn here. PETA urges this Court to adopt Judge Edison's Report and Recommendation and deny TAMU's motion to dismiss.

## FACTUAL BACKGROUND

PETA is "a well-known animal-protection advocacy organization," R&R at 2, "dedicated to protecting non-human animals from abuse, neglect, and cruelty," FAC ¶ 4.

For seven years, TAMU intentionally bred golden retrievers and other puppies to have a canine version of muscular dystrophy, *id.* ¶ 48, including Duchenne muscular dystrophy—"a particularly severe form of the disease that causes progressive muscle wasting and weakness," *id.* ¶ 48 n.21. Not content to rely on wasting disease alone, researchers also push on the dogs' muscles with levers to stretch and damage them. *Id.* Images "show[] golden retrievers struggling to walk and eat. Drool drip[s] from the mouths of dogs whose jaw muscles ha[ve] weakened as a result of disease." *Id.* Rather than curled up on the couch with a human family, the dogs experimented on by TAMU live their lives of "pain[]" and "suffering" in "barren kennels." *Id.* ¶ 48 & n.21.

PETA has campaigned since 2016 to end the pain and suffering of these golden retrievers and other dogs. PETA has sent letters to government officials; contacted funding agencies; protested outside Board of Regents' meetings; helped students craft petitions; livestreamed protests over Twitter; alerted its Facebook followers of corporations that

sponsor the lab; and produced a video by political commentator Bill Maher, *id.* ¶¶ 49-50, among other activities. Three years into PETA's campaign, TAMU announced that it would stop breeding puppies to develop this debilitating disease, but as many as twenty-nine dogs remain in the university's laboratory. *Id.* ¶ 49.

Social media has always been a "critical tool" in the campaign, *id.* ¶ 50, and PETA has repeatedly protested the dog lab on TAMU's social media pages, *id.* ¶¶ 51-53, 60, 69, 79. In 2017, PETA sued TAMU's president for blocking its posts on the university's social media. *Id.* ¶¶ 51-54. After two years of litigation, the parties reached settlement in early 2020. *Id.* ¶ 55-56. TAMU's president agreed not to block or filter PETA's comments on TAMU's Facebook page and not to discriminate against PETA's viewpoint, and PETA retained the right to challenge TAMU's social media policy in the future. *Id.* ¶¶ 57-59.

With the ink on the settlement barely dry, PETA immediately resumed protesting the abuse and neglect of the dogs on TAMU's social media, *id.* ¶¶ 60, 68, 76, and TAMU immediately resumed its censorship of PETA. Not *once*, not *twice*, but on at least *three* separate occasions in May 2020, TAMU deleted a total of more than 130 comments mentioning the TAMU dog lab by PETA staff and supporters. *Id.* ¶¶ 61-63, 70-71, 79. TAMU deleted comments related to the graduation ceremonies being livestreamed and expressing hope that graduates would use their educations to help end TAMU's dog experiments. *Id.* To this day, TAMU still has not restored the comments it deleted. *Id.* ¶¶ 65, 73. PETA was left with little choice but to bring the current lawsuit to protect its speech and continue to provide a voice for the golden retrievers and other dogs in TAMU's laboratory.

---

**ARGUMENT**

**I.     The president of TAMU is a proper defendant under *Ex parte Young*, and PETA's injury is traceable to her.**

TAMU's president has comprehensive authority on campus and could redress PETA's injuries with a wave of the hand. That makes her a proper defendant under *Ex parte Young*. *See Air Evac EMS v. Tex. Dep't of Ins.*, 851 F.3d 507, 513-14 (5th Cir. 2017) ("[T]here is significant overlap between standing and *Ex parte Young*'s applicability."). As Judge Edison emphasizes, the office of the president purported to do so when it settled the previous censorship lawsuit and agreed not to block, filter, or discriminate against PETA's speech. Now, TAMU's president asks this court to both ignore that her office signed this legally binding contract and be the first court to hold that public university presidents are not responsible for what their institutions do.

**a.     The settlement conceded the president's enforcement connection to social media censorship.**

"'Enforcement' typically involves compulsion or constraint." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). TAMU's previous president agreed, in his official capacity, that TAMU would not "add[] any settings in the future to block or filter, whether automatically or manually, PETA or its comment on TAMU's Facebook page," nor would it "exercise viewpoint discrimination when administering its Facebook page, [in particular] against PETA." FAC ¶¶ 57-58. To legally bind TAMU not to "constrain[]" PETA's speech in these ways, *K.P.*, 627 F.3d at 124, the previous president must have had enforcement power over social media blocks, filters, and viewpoint discrimination. As Judge Edison explains, it is therefore "entirely plausible" that his successor also "has at least 'some

connection' to the challenged behavior in this litigation," as *Ex parte Young* requires. R&R at 8-9 (quoting *Air Evac EMS*, 851 F.3d at 517).

> **b.      TAMU's president has comprehensive authority on campus.**

University presidents are responsible for university actions—this is "so unobjectionable," as Judge Edison puts it, that neither he nor the parties could locate a case to the contrary. R&R at 9-10. Indeed, numerous cases have found *Ex parte Young* jurisdiction over university presidents in their official capacity. *E.g., Nelson v. Univ. of Tex.*, 535 F.3d 318, 324 (5th Cir. 2008).

Here, PETA alleges that TAMU's president "has authority over all TAMU policies and practices, including those challenged here." FAC ¶ 5; *see also* id. ¶¶ 1, 56-58. By contrast, the incarcerated plaintiff in *Haverkamp v. Linthicum*, on which the government relies, did not allege that the defendant doctor had any enforcement connection to the challenged medical and commissary denials. 6 F.4th 622, 671 (5th Cir. 2021). Indeed, the complaint did not plead a single action by this defendant. *Haverkamp v. Penn et al*, Plaintiff's Amended Complaint, Dkt. 62, No. 2:17-cv-00018 (S.D. Tex. Oct. 15, 2017).[1]

For the same reason, this case also differs from the government's other cases, which denied *Ex parte Young* jurisdiction because the official's enforcement power did not include the challenged practice. *E.g., Richardson v. Flores*, 28 F.4th 649, 654-56 (5th Cir. 2022) (Texas election law distinguishes between authority of "local election officials" and

---

[1] *Haverkamp* is also distinguishable because the "complaint named [the doctor] as a defendant in her role as an employee of UTMB [the University of Texas Medical Branch]," even though the Texas Department of Criminal Justice, not UTMB, denied the plaintiff's requests. 6 F.4th at 666, 670-71. Here, PETA properly named TAMU's president in her official capacity.

defendant Secretary of State, with challenged signature verification falling only to former); *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 180-81 (5th Cir. 2020) (plaintiffs identified Texas election provisions authorizing defendant Secretary of State to enforce challenged voting restriction, but none as to defendants Governor or Attorney General); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (challenged law makes agency, not Governor, "responsible for the section's administration and enforcement").

Consequently, the government has cited no authority to support its extreme position that university presidents are not responsible for university actions, and this Court should decline to be the first court to so hold.

### c.    TAMU's president handles high-profile issues like censoring PETA.

PETA's campaign is a high-profile issue for TAMU, which naturally falls within the university president's bailiwick. Again, PETA is a "well-known animal-protection advocacy organization." R&R at 2. For six years, PETA has been campaigning against TAMU's experiments on golden retrievers and other dogs and publicly exposing the dogs' pain and suffering. FAC ¶¶ 48 n.21, 49. These experiments are part of the university's "extensive record of scientific research funded through U.S. government grants and organizations." *Id.* ¶ 5. PETA campaigns against the dog lab at what TAMU calls "life-defining event[s]," like graduation ceremonies. MTD at 1. Indeed, TAMU's president has censored PETA's comments on "highly-viewed graduation celebration videos streamed during the height of a once-in-a-century pandemic." Obj. at 17. PETA has also protested at Board of Regents' meetings and garnered press coverage and celebrity criticism of TAMU's dog lab. FAC ¶ 49. If all this were not enough to grab the attention of TAMU's

president, the university spent two years on a previous lawsuit with PETA on this issue and paid $75,000 in PETA's attorney fees. *Id.* ¶ 55-59; Settlement Agreement at 1.e. Therefore, PETA more than plausibly alleges that TAMU's president has enforcement power over the university's response to PETA's high-profile campaign, including censoring PETA.

## II.   PETA sufficiently alleges that it intends to continue campaigning against TAMU's experiments on dogs.

PETA states an Article III injury because it alleges both an intent to engage in protected speech and a credible threat of TAMU's unconstitutional censorship. This satisfies both *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), and *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

As Judge Edison explains, PETA's "serious intent" to continue protesting TAMU's cruel experiments is "evidenced by PETA's past campaigns and litigation." *Id.* at 11-12. PETA has posted on the university's social media for years to end the dogs' pain and suffering, and resumed "the same speech after settling the first litigation," R&R at 12.

Just as here, the Supreme Court in *Driehaus* found standing because of the petitioners' history of advocacy and their alleged "'inten[t] to engage in substantially similar activity in the future.'" 573 U.S. at 161 (brackets in original, quoting petitioners' brief). The Court looked to its previous decision in *Babbitt*, where "[t]he plaintiffs had 'actively engaged in consumer publicity campaigns in the past' and alleged 'an intention to continue' those campaigns in the future." *Driehaus*, 573 U.S. at 160 (quoting *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 301 (1979)). Likewise, in *Justice v. Hosemann*, the Fifth Circuit held that the plaintiffs' plan to "continu[e] their political advocacy in future ballot

initiative cycles . . . about other ballot initiatives" was sufficient under *Driehaus*; the plaintiffs' "past enthusiastic participation in the political process indicate[d] that they would have done so" absent the government's interference. 771 F.3d 285, 291 (5th Cir. 2014). Indeed, PETA's intent to speak about the *same* issue in the *same* forums is even more concrete than the *Hosemann* plaintiffs' plans as to "other" ballot initiatives concerned with "other" public policy issues. *See id.*

PETA's detailed allegations of its long-running, ongoing campaign are in stark contrast to the single, completed action taken by the plaintiff in *Machete Productions v. Page*, relied on by TAMU. There, a film production company "failed to show any imminent plans to produce another film in the *Machete* franchise." 809 F.3d 281, 288 (5th Cir. 2015). The plaintiff already released the franchise film it produced and pled no other history or ongoing or imminent productions. *Id.* at 286, 289. And PETA's plans to post on social media require far less detailed support than did Machete's plans to produce a film—which, in the early stages alone, requires drafting a screenplay, obtaining financing, finding shoot locations, hiring key crew, and so on.

In *Elend v. Basham*, the other case relied on by the government, the plaintiffs did not adequately plead an intent to protest at future presidential appearances because they "fail[ed] to provide any limitation on the universe of possibilities of when or where or how such a protest might occur." 471 F.3d 1199, 1209 (11th Cir. 2006). The Eleventh Circuit stressed that, other than a single instance, it was "not even given a description of Plaintiffs' past conduct from which to infer that they might act in a similar manner in the future." *Id.* Moreover, it was "entirely conjectural that [the president] would return to speak" at the

same forum. *Id.* That could not be further from the case here, where PETA has offered many examples of the types of comments it has posted in the past and wishes to post on the same social media in the future.

Thus, "PETA's 'past enthusiastic participation' in protesting TAMU's muscular dystrophy research," paired with its allegations "that it 'wishes to continue posting comments,'" R&R at 11-12 (quoting *Hosemann*, 771 F.3d at 291; FAC ¶¶ 66, 74, 82), amply demonstrates PETA's intent to continue speaking. As Judge Edison notes, PETA has no obligation to "post[] comments on TAMU's social media sites and wait[] to see if those comments get deleted." R&R at 13 (quoting MTD at 5). The Defendant misses the mark when she cites *Zimmerman v. City of Austin* to the contrary: There, the plaintiff faced a penalty only if he raised campaign funds *above* the $36,000 statutory ceiling, but he didn't try to raise any funds at all. 881 F.3d 378, 389 (5th Cir. 2018). Here, TAMU has already deleted PETA's comments, and PETA faces a credible threat that the university will do so again. Pleading "intent to engage" does not require tilting at windmills. PETA need not take time to post comments that it knows will be taken down, just to prove that it wishes to post comments that will *not* be taken down.

The objection fails to raise a serious question about Judge Edison's conclusion. Again, PETA is "a well-known animal-protection advocacy organization," R&R at 2; it alleges that TAMU's dog laboratory has for a decade tormented golden retrievers and other dogs, FAC ¶ 48 & n.21; it has invested heavily since 2016 in its campaign to end the dogs' pain and suffering, *id.* ¶¶ 48-50; it has protested the laboratory on TAMU's social media for years, *id.* ¶¶ 50-51, 60, 69, 79; it "previously sued TAMU's President for discriminating

against its speech," R&R at 12; and it resumed "the same speech after settling the first litigation," *id*. If PETA has not alleged a "serious intent" to "post protest comments on TAMU's social media pages in the future," Obj. at 11, it is hard to know what would suffice.

## III. PETA sufficiently alleges a credible threat that TAMU will continue its censorship.

In addition to establishing its intent to engage in protected speech, PETA sufficiently alleges a credible threat that TAMU will continue to unlawfully censor that speech. This satisfies Article III standing requirements under both *Driehaus* and *Lyons*.

### a. PETA sufficiently alleges that TAMU unlawfully censored its speech.

The First Amended Complaint repeatedly alleges that TAMU's president committed "viewpoint-based, content-based, and speaker-based" discrimination against PETA, including via "enforcement of [TAMU's] current social media policies." FAC ¶¶ 66, 74, 82. Even after PETA sued and settled with TAMU's president for previous discrimination,[2] TAMU deleted more than 130 comments by PETA and its supporters, such as these on the College of Veterinary Medicine & Biomedical Sciences' Facebook page: "By now the graduating students should realize that TAMU's experiments on dogs are cruel and pointless," and "TAMU needs to shut down its cruel dog labs! I hope these graduates will usher in a new, more compassionate era!" *Id.* ¶¶ 60-61.

---

[2] TAMU's previous censorship provides yet more evidence that TAMU's discrimination against PETA is indeed viewpoint-based, content-based, and speaker-based. The university used automatic filters to exclude posts and comments containing the words "PETA," "cruelty," "abuse," "lab," and "torture," among others, while allowing messages like "TAMU rules! Go aggies." FAC ¶¶ 51-54.

At this stage, PETA's well-pled allegations of viewpoint discrimination take precedence over TAMU's claim that it deleted PETA's comments for "*constitutional reasons*" via "honest application" of its policy. Obj. at 18; *see Stratta v. Roe*, 961 F.3d 340 (5th Cir. 2020) ("When reviewing 12(b)(1) dismissals, we take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff.") (citation and internal quotation omitted). As Judge Edison notes, "Whether TAMU's enforcement of its social media policies comports with the First Amendment and whether it was constitutionally permissible to delete PETA's comments is not for [the court] to decide at this juncture." R&R at 14.

In fact, TAMU's president herself admits that its discrimination was content-based. She contends that PETA's comments were deleted "because they violated TAMU's social media policy, which warns that comments not 'directly related to the topic of the original post from the page . . . may be removed.'" MTD at 5; *accord* Berend Decl. ¶¶ 5, 10. Even if taken as true that TAMU applied its "on-topic" policy (and did so in an even-handed manner that was not itself unconstitutional), "a policy of deleting 'inappropriate' comments is viewpoint discriminatory." R&R at 23 (quoting *Robinson v. Hunt Cnty.*, 921 F.3d 440, 449 (5th Cir. 2019)). Censoring PETA's speech because the content does not take a university-approved approach to the topic at hand plainly constitutes content-based discrimination. And disparaging PETA's speech as "spam" does nothing to change this. *See id.* at 22 (approving PETA's observation that "President Bank's characterization of PETA's viewpoint as 'spam' is itself 'an official policy of viewpoint discrimination'") (quoting Pl.'s Opp. to Def.'s Mot. to Dismiss (Opp.) at 28).

The government's claim that PETA "spammed" "thousands" of comments, Obj. at 17, is just a smokescreen: By the president's own admission, TAMU deleted the comments because of *what* PETA had to say—not how often PETA said it. Moreover, this claim is contradicted by both *her own brief*, *see* MTD at 5, and the detailed allegations in the complaint, entitled to deference, that the number of comments was orders of magnitude smaller than "thousands," *see* FAC ¶¶ 60-61, 69, 79.

PETA's well-pled allegations also contradict the government's eleventh-hour contention that PETA "drowned out other voices in the forum." Obj. at 17-18. TAMU deleted PETA's comments on the May 8, 2020, livestream, for example, even though the organization alleges that it posted only a small fraction of the more than 4,700 comments posted. FAC ¶¶ 69-70. Even if these allegations weren't dispositive at this stage, TAMU certainly offers no facts showing that other people couldn't be heard, and courts have been skeptical of this defense in the digital context. *See, e.g., Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1181 (9th Cir. 2022) ("In contrast to meetings in the physical world, the features of Facebook and Twitter rendered the [plaintiff's] repetitive comments only minimally distracting" because viewers could scroll past them). Regardless, TAMU has "forfeited" this merits argument "by raising it for the first time in their objection to the magistrate judge's Report and Recommendation." *See Firefighters' Ret. Sys. v. EisnerAmper, L.L.P.*, 898 F.3d 553, 559 (5th Cir. 2018).

President Bank's assertion that "a credible threat of future viewpoint discrimination" cannot be "fairly traceable to a policy barring such discrimination" likewise holds no water. Obj. at 15. No plaintiff would ever have a cognizable

constitutional claim if they could only challenge the government's "Policy to Expressly Violate the Constitution." In *Speech First v. Fenves*, the Fifth Circuit rejected this precise argument, finding that the "University's policies arguably cover[ed] Speech First's members' intended speech," despite the "policies' paeans to the freedom of speech." 979 F.3d 319, 333-34 (5th Cir. 2020). As Judge Edison makes clear, it is enough here that TAMU's policy was the "driving force" behind PETA's censorship. R&R at 22 (quoting *Robinson*, 921 F.3d at 449). TAMU cannot add magic words to its social media policy to prevent constitutional claims.

### b. PETA sufficiently alleges that TAMU will continue to unlawfully censor its speech.

PETA has more than sufficiently alleged that a "credible threat" of ongoing unlawful censorship exists. *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). As Judge Edison concludes, "it [is] reasonable to expect that TAMU will attack PETA's speech again." R&R at 13. After all, as the complaint alleges, the Constitution did not stop TAMU from deleting PETA's comments. Two years of litigation did not stop TAMU from deleting PETA's comments. Paying $75,000 in attorneys' fees to PETA did not stop TAMU from deleting PETA's comments. Agreeing in a legally binding contract "not [to] exercise viewpoint discrimination against PETA or PETA's supporters and members" did not stop TAMU from deleting PETA's comments. Settlement Agreement at 1 (Consideration). TAMU has given this Court no reason to believe it will stop deleting PETA's comments now.

---

When dealing with ongoing speech restrictions at the motion-to-dismiss stage, courts "assume a credible threat of prosecution in the absence of compelling contrary evidence" in the record. *Barilla v. City of Houston*, 13 F.4th 427, 432 (5th Cir. 2021) (quoting *Speech First*, 979 F.3d at 335). TAMU admits it censored PETA's speech on the basis of a university policy. *E.g.*, R&R at 19 (quoting MTD at 2). As Judge Edison stresses, "[t]hat policy is ongoing." *Id.* at 19. And TAMU's president has offered no compelling evidence that TAMU will stop censoring PETA's speech; indeed, quite the opposite. *See, e.g.*, Obj. at 17-18 (deriding PETA's speech as "spam" that violates TAMU's social media policy). This is dispositive.

Even without this presumption, however, TAMU's repeated censorship of PETA's speech and failure to disavow its policy dictate the same result. To determine whether a "credible threat" of enforcement existed in *Driehaus*, the Supreme Court considered (1) whether there was a history of past enforcement of the challenged law or policy, and (2) whether the defendants had disavowed future enforcement. Both factors support PETA here. 573 U.S. at 164-65. The Court has repeatedly stated that "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Id.* at 164; *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Here, TAMU previously censored PETA's comments *multiple times*. Several of these instances occurred ***after*** PETA had already sued TAMU over the censorship, and TAMU had already agreed "not [to] exercise viewpoint discrimination against PETA or PETA's supporters and members." FAC ¶¶ 56-57, 61-63, 70-71, 79. At this stage, these allegations are dispositive.

Moreover, far from disavowing its unlawful actions, TAMU's president has only doubled down on her position that PETA's comments were lawfully deleted "because they violated TAMU's social media policy." *E.g.*, R&R at 19 (quoting MTD at 2). Indeed, even in the Objections, the government insists on referring to PETA's speech as "spam." Obj. at 17-18. As Judge Edison concludes, "President Banks has made clear that TAMU considers PETA's comments violative of its policies. These statements only serve to bolster PETA's allegations that TAMU's enforcement of its policies *continues* to hamper PETA's advocacy campaigns." R&R at 20.[3]

For the same reasons, PETA's injury is "'real and immediate,' not 'conjectural' or 'hypothetical.'" *Lyons*, 461 U.S. at 102. Lyons didn't have standing because "the threat [to him] was attenuated by both the unlikeliness that Lyons would have another encounter with the police and the unlikelihood that the police would employ a chokehold during that encounter." *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004) (summarizing *Lyons*, 461 U.S. at 101-09).[4] Similarly, chances were "slim" that the plaintiff in *Society of Separationists v. Herman* would be selected for a jury and face the same judge again, and that the judge, "[who] was not acting pursuant to any state or local rule or statute, or even some personal

---

[3] The Fourth Circuit's 2019 opinion in *Davison v. Randall* is on all fours with the current case. There, a county resident sought injunctive relief against the Chair of the County Board of Supervisors after she banned him from the Chair's Facebook page. The court held that the plaintiff alleged a "credible threat of enforcement," because the defendant "previously blocked [him] from the Chair's Facebook Page based on the content of his posts, providing good evidence that the threat of enforcement [was] not chimerical," and the Chair continued to state that "comments 'attacking another person' would not be allowed on her 'Chair's Facebook' page." 219 F.3d 666 at 678-79 (4th Cir. 2019) (internal citations and quotation marks omitted).

[4] The Fifth Circuit has also "f[ound] a critical factual distinction between *Lyons*"—where the plaintiff's standing theory "assume[d] that the party seeking relief w[ould] repeat the type of *misconduct* that would once again place him or her at risk of [a given] injury"—and cases, like the present one, in which the plaintiff is "engaged in an activity protected by the Constitution." *Hernandez v. Cremer*, 913 F.2d 230, 234-35 (5th Cir. 1990) (emphasis in original).

policy," would exclude them. 959 F.2d 1283, 1285-86 (5th Cir. 1992). By contrast, PETA has evinced a "serious intent" to continue protesting TAMU's cruel experiments, and "it [is] reasonable to expect that TAMU will attack PETA's speech." R&R at 12-13.

The threat to PETA from continuing enforcement of TAMU policy is more than credible—it is undeniable—and this Court should adopt Judge Edison's opinion to that effect.

## IV.    PETA sufficiently alleges that TAMU's failure to restore the comments of PETA and its supporters causes it injury-in-fact.

Independently of *Driehaus* and *Lyons*, TAMU's failure to this day to restore PETA's comments causes "ongoing injuries [that] are, by definition, *actual* injuries for purposes of Article III standing." *See Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018) (emphasis in original). TAMU is violating PETA's rights both to speak and to receive information. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969). PETA wishes to continue engaging with and reading these comments. FAC ¶¶ 67, 75, 83. PETA has the right to be heard by members of the TAMU community and the public who will revisit these "life-defining event[s]." *See* MTD at 1.

The Fifth Circuit has held that "the fact that a current violation can be traced to a past action does not bar relief under *Ex parte Young*." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 737-38 (5th Cir. 2020). "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression." *McCutcheon v. FEC*, 572 U.S. 185, 203 (2014). As long as TAMU's archives of these "highly-viewed graduation celebration videos" of "life-defining event[s]," Obj. at 17, MTD at 1, remain "available for

viewing by any individual who wishes to re-live or view this event," FAC ¶¶ 65, 73, the "public debate" is ongoing.

In *Spec's Family Partners, Ltd. v. Nettles*, the Fifth Circuit held that no injury-in-fact existed, because it was "undisputed that the investigation and [administrative] proceedings forming the basis of the allegations in th[e] case [were] completed." *See* 972 F.3d 671, 681 (5th Cir. 2020). Here, by contrast, TAMU's viewpoint discrimination against PETA's animal rights campaign is continuing into its fifth year without being "completed." PETA is injured every day that TAMU violates PETA's First Amendment right to participate in the public debate by failing to restore its comments. *Contra* Obj. at 21.[5]

## V.    PETA sufficiently alleges that a prospective injunction would likely redress its injuries.

PETA seeks an injunction requiring the TAMU's president to (1) restore all deleted comments, and (2) prohibit further censorship of PETA's speech. FAC, Prayer for Relief, ¶ 2. Since PETA's "complaint alleges a continuing violation [and] the imminence of a future violation, [its] prayer for injunctive relief satisfies redressability." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 397 (5th Cir. 2015) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)).

PETA need only show that TAMU's censorship and its harm "would be reduced to some extent" by an injunction. *See Massachusetts v. EPA*, 549 U.S. 497, 526 (2007).

---

[5] *Cf. Nat'l Parks Cons. Ass'n v. TVA*, 480 F.3d 410, 419 (6th Cir. 2007) (holding that a power plant violated the Clean Air Act every day that it continued operating without a construction permit, not only when construction was ongoing); *In re Bluewater Network*, 234 F.3d 1305, 1315-16 (D.C. Cir. 2000) (recognizing that an agency's "continuing recalcitrance" in meeting a finite deadline constituted an ongoing violation of law).

---

PETA's requested injunction will stop TAMU's imminent censorship of PETA's future speech. An injunction could also require TAMU to restore PETA's censored comments in some way.[6] PETA's "prospect of obtaining relief" is therefore far from "speculative." *Ne. Fla. Chapter, Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663-64 (1993).

## VI.    PETA sufficiently alleges injury from TAMU's censorship of others that PETA wants to hear.

PETA repeatedly alleges that TAMU is violating PETA's right to hear from supporters of its campaign, as well as from "other advocates for non-human animals confined by TAMU," so that it can both "engage with and read" these comments and "evaluat[e] the reach, influence, persuasiveness, and impact" of its campaign. FAC ¶¶ 60-62, 65-67, 73-75, 79-83. "It is now well established that the Constitution protects the right to receive information and ideas." *Stanley*, 394 U.S. at 564. PETA often campaigns "through its employees and supporters" who "post[] comments about TAMU laboratories," FAC ¶ 66, but PETA does not own the speech of every supporter or animal advocate. These other advocates are willing speakers, injured by TAMU's censorship, and this in turn injures PETA's right to hear them.

## VII.    PETA need not allege that its mission was perceptibly impaired.

TAMU's censorship and failure to restore the comments it deleted violates the First Amendment and thus "unquestionably satisfies Article III's injury-in-fact requirement."

---

[6] TAMU asserts it cannot restore the deleted comments. Obj. at 19. But PETA retains copies of them (and on request, will submit a declaration to this effect). If this Court commands restoration, then redress can take many viable forms: For example, TAMU could re-post these deleted comments on one of its online forums.

*See Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

TAMU "is obviously wrong," as Judge Edison puts it, to try to graft on additional pleading requirements. R&R at 17. PETA's injury here is to its First Amendment rights, not its "ability to provide services," so it need not allege that any services were "perceptibly impaired." *See Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015). There is

> no support in the First or Fourteenth Amendment, or in the decisions of th[e Supreme] Court, for the proposition that speech that otherwise would be within the protection of the First Amendment loses that protection simply because its source is a corporation that cannot prove, to the satisfaction of a court, a material effect on its business or property.

*See First Nat'l Bank v. Bellotti*, 435 U.S. 765, 784 (1978).

## VIII.  PETA states a valid claim under section 1983.

"To state a section 1983 claim, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (internal citation omitted). PETA has done so: The President of TAMU is discriminating against PETA's viewpoint in her official capacity. FAC ¶¶ 1, 66-67, 74-75, 82-83, 85.

Section 1983 does not require a plaintiff to allege that any government policy or custom is at issue to seek an injunction in an official-capacity suit. *Cf.* Obj at 23.[7] Nevertheless, "[b]y President Banks's own admission, PETA's comments were deleted because they 'violated TAMU's social media policy.'" R&R at 22 (quoting MTD at 14). Further, TAMU's repeated characterization of PETA's speech as unprotected "spam" shows that the university interprets its social media policy's on-topic rule as "an official policy of viewpoint discrimination." *See Robinson*, 921 F.3d at 449-50. And, as discussed above, *supra* Sec. III.a., the policy's nominal prohibition of such discrimination cannot save it.

TAMU relies on *Gonzalez v. Ysleta Independent School District* to tack on a nonexistent requirement that PETA allege that TAMU acted with "deliberate indifference." Obj. at 23-24. But *Gonzalez* is inapposite because it only discusses the irrelevant *Monell* liability doctrine for local governments. *See* 996 F.2d 745, 753-54 (5th Cir. 1993) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). More critically, even if *Gonzalez* were relevant, as Judge Edison explains, its "deliberate indifference" standard "is inapplicable," because TAMU admits that it deleted PETA's comments pursuant to its policy. R&R at 22.

---

[7] *See Kentucky v. Graham*, 473 U.S. 159, 166, 167 n.14 (1985) ("[A] plaintiff seeking to recover on a *damages* judgment in an official-capacity suit must look to the government entity itself. . . . [W]hen the entity itself is a moving force behind the deprivation[,] . . . the entity's policy or custom must have played a part in the violation of federal law. . . . [O]fficial-capacity actions for *prospective relief* are not treated as actions against the State.") (cleaned up) (emphases added). The *Shisinday v. Johnson* panel's unpublished, nonprecedential opinion did not consider this exception. See 234 F.3d 28, 2000 WL 1568146 at *3 (5th Cir. 2000).

Thus, there is little question that PETA has validly stated a § 1983 claim.[8]

## CONCLUSION

For the foregoing reasons, PETA respectfully urges this Court to overrule TAMU's objections to the Magistrate Judge's Report and Recommendation.

Dated:  September 30, 2022

Respectfully submitted,

*/s/ Christopher W. Rothfelder*
CHRISTOPHER W. ROTHFELDER
Texas State Bar No. 2408470
Southern District I.D. 2449594
crothfelder@rothfelderfalick.com
Rothfelder & Falick, L.L.P.
1201 Louisiana St., Suite 550
Houston, TX 77002
713.220.2288 telephone
713-658-8211

*Local Counsel and Attorney-In-Charge for Plaintiff People for the Ethical Treatment of Animals, Inc.*

---

[8] PETA also "has a cause of action against" TAMU's president at equity, "regardless of whether it can invoke § 1983." *See Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (*en banc*) (citing *Ex parte Young*, 209 U.S. 123, 149 (1908)).

OF COUNSEL:

MUKUND RATHI*
California Bar No. 330622
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
415.436.9333 telephone
415.436.9993 facsimile
mukund@eff.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*
*People for the Ethical Treatment of Animals, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record via Electronic Delivery on this the 30th day of September, 2022.

*/s/ Christopher W. Rothfelder*
Christopher W. Rothfelder