United States District Court
Southern District of Texas
**ENTERED**
September 01, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., § § § | |
| Plaintiff. § | |
| § | CIVIL ACTION NO. 4:20-cv-02913 |
| V. § | |
| § | |
| MARK A. WELSH, III, § § | |
| Defendant. § | |

## AMENDED MEMORANDUM AND RECOMMENDATION

In this lawsuit, People for the Ethical Treatment of Animals, Inc. ("PETA") has sued Mark A. Welsh, III[1] ("Welsh"), in his official capacity as the Interim President of Texas A&M University ("TAMU"), for allegedly violating PETA's freedom of speech under the First Amendment to the United States Constitution.

Presently before me is Defendant's Motion to Dismiss Plaintiff's First Amended Complaint ("Motion to Dismiss"), which argues that this Court lacks subject-matter jurisdiction and that PETA fails to state a claim under 28 U.S.C. § 1983. *See* Dkt. 43. PETA has responded, *see* Dkt. 48, TAMU has replied, *see* Dkt. 49, and PETA has added a sur-reply to the mix. *See* Dkt. 54. Both parties also filed "advisories" with the Court. *See* Dkts. 56–57. Having reviewed the parties' voluminous briefing and analyzed the applicable legal authorities, I **RECOMMEND** the Motion to Dismiss be **GRANTED**.

---

[1] When PETA filed this lawsuit, it identified Dr. Michael K. Young ("President Young"), then the President of TAMU, as a defendant. TAMU has changed Presidents three times since then. *See, e.g.*, Dkt. 35 at 1 n.1 (substituting M. Katherine Banks as the defendant in this litigation when she became the 26th President of TAMU). Most recently, Welsh became the new Interim President at TAMU on July 21, 2023. Pursuant to Federal Rule of Civil Procedure 25(d), Welsh has taken Banks's position as a defendant in this litigation. *See* FED. R. CIV. P. 25(d); *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Indeed, when officials sued in this [official] capacity in federal court die or leave office, their successors automatically assume their roles in the litigation.").

## BACKGROUND[2]

PETA is a well-known animal-protection advocacy organization. Founded in 1970, PETA uses public education, celebrity involvement, and protest campaigns to further its objective of ending the abusive treatment of animals in society.

In 2012, TAMU began breeding dogs with a canine version of muscular dystrophy at a campus laboratory. This research is conducted by TAMU in hopes of finding possible treatments for humans afflicted with muscular dystrophy. According to PETA's First Amended Complaint, the dogs held by TAMU "suffer during painful experiments and procedures and are housed in barren kennels." Dkt. 39 at 16.

Shortly after learning about the TAMU dog laboratory in 2016, PETA began protesting the lab's use of dogs. PETA's advocacy campaign includes frequent posting on TAMU's social media accounts, including the TAMU College of Veterinary Medicine & Biomedical Sciences' ("CVMBS") Facebook page, TAMU's Facebook page, and TAMU's YouTube page.

In late 2017, PETA noticed that content it attempted to post to TAMU's Facebook page failed to appear on TAMU's Facebook page as it had in the past. PETA concluded that TAMU was using an automatic filter setting "to prevent PETA and other critics of TAMU's dog laboratory from posting any information or opinions to the TAMU Facebook Page about their campaign to end canine muscular dystrophy experiments." *Id*. at 17. As a result, PETA brought suit in 2018 against President Young, alleging that TAMU blocked PETA from posting certain content on TAMU's Facebook page in violation of PETA's rights under the First Amendment. The parties eventually settled the case.

As part of the settlement, President Young agreed that TAMU would remove any settings that operated to block or filter PETA's comments on TAMU's

---

[2] This section is taken from the First Amended Complaint for Declaratory and Injunctive Relief ("First Amended Complaint"). *See* Dkt. 39. At this juncture of the case, I accept all well-pleaded allegations as true.

Facebook page; that TAMU would not exercise viewpoint discrimination against PETA, its supporters, or members when administering its Facebook page; nor would it set automatic or manual blocking filters on PETA's comments made to TAMU's Facebook page, provided that TAMU could remove comments not in compliance with its Facebook Usage Policy. PETA explicitly retained the right to bring a facial challenge to that policy and to bring an as-applied challenge to the manner that TAMU applies that policy. In relevant part, "TAMU's Social Media Policy states that 'comments must be directly related to the topic of the original post from this page or may be removed.'" Dkt. 43-2 at 2.

In early 2020, the COVID-19 pandemic swept the nation, and group gatherings turned virtual. Like many other universities across the country, TAMU held virtual graduation ceremonies in May 2020 that were livestreamed on its social media platforms, including Facebook and YouTube. In this case, PETA alleges TAMU engaged in viewpoint discrimination by deleting PETA's comments protesting TAMU's dog laboratories from TAMU's Facebook and YouTube livestreams of its graduation ceremonies. According to PETA, 54 of the 80 comments PETA employees and supporters posted on the CVMBS Facebook livestream were deleted, 64 of the 413 comments PETA employees posted to the TAMU Facebook livestream were deleted, and at least 19 of the 70 comments PETA employees and supporters posted on the TAMU YouTube livestream were initially deleted. Deleted comments included:

- "If you care about animals, class of 2020, please be the ones to shut down TAMU's abusive and deadly dog lab."
- "Proud of the grads! Disgraced at the administration for supporting the MD dog laboratory on campus. PETA.org/TAMU."
- "Congrats, graduates. Now please help us in urging TAMU to stop their cruel experiments on animals."
- "I hope the University will recognize that there is no better . . . time than now to do the right thing and release the dogs used for cruel muscular dystrophy experiments to loving adoptive homes."

3

Dkt. 39 at 19, 21, 23. TAMU subsequently deleted the entire graduation video from its YouTube channel, including all comments.

PETA's First Amended Complaint asserts a single cause of action against TAMU for deprivation of its First Amendment rights. As far as remedies are concerned, PETA seeks: (1) a declaratory judgment that TAMU's censoring of PETA's speech—by deleting comments that PETA posts on TAMU's social media pages—is unconstitutional; (2) an injunction requiring TAMU to restore previously deleted comments and prohibiting TAMU from engaging in viewpoint discrimination in the future; and (3) an award of costs and attorneys' fees.

TAMU has moved to dismiss the First Amended Complaint. TAMU argues this case should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and Rule 12(b)(6) for failure to state a claim. Where, as here, a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, I must assess the Rule 12(b)(1) jurisdictional issue first. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Because I find that this court lacks subject-matter jurisdiction, my inquiry begins and ends with Rule 12(b)(1).

## LEGAL STANDARD

Rule 12(b)(1) allows a party to challenge the subject-matter jurisdiction of the district court to hear a case. *See* FED. R. CIV. P. 12(b)(1). A claim is properly dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1) when "the court lacks the statutory or constitutional power to adjudicate the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Miss. Plaintiffs)*, 668 F.3d 281, 286 (5th Cir. 2012) (quotation omitted). District courts may dismiss a claim for lack of subject-matter jurisdiction upon consideration of: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Spotts v. United States*, 613 F.3d 559, 566 (5th Cir. 2010) (quotation omitted).

Standing is a jurisdictional question that concerns "the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Article III of the U.S. Constitution limits the power of federal courts to the resolution of "Cases" or "Controversies." U.S. CONST. art. III, § 2. The requirement that a plaintiff establish standing to bring suit "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Every plaintiff in federal court must, therefore, meet the "irreducible constitutional minimum" of Article III standing, which requires: (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury be fairly traceable to the challenged action; and (3) that it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable ruling. *Id.* at 560–61. Plaintiffs must satisfy these requirements whether suing as an individual or an organization. *See Vote.org v. Callanen*, 39 F.4th 297, 303 (5th Cir. 2022).

The party asserting federal jurisdiction bears the burden of demonstrating that standing exists. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). In evaluating a Rule 12(b)(1) motion, I accept all well-pleaded factual allegations in the complaint as true, viewing them in the light most favorable to the plaintiff. *See Daniel v. Univ. of Tex. Sw. Med. Ctr.*, 960 F.3d 253, 256 (5th Cir. 2020). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming*, 281 F.3d at 161.

## ANALYSIS

TAMU argues that PETA fails to plead an enforcement connection between TAMU's President and the alleged constitutional violations at issue, and that this purported failure speaks to both a lack of standing—specifically, traceability and redressability—and the availability of *Ex parte Young*'s equitable exception. Before

5

addressing these arguments, it is worth reviewing the relevance of *Ex parte Young*, 209 U.S. 123 (1908):

> The Eleventh Amendment bars suits by private citizens against a state in federal court, irrespective of the nature of the relief requested. A plaintiff may not avoid this bar simply by naming an individual state officer as a party in lieu of the State. Yet, few rules are without exceptions, and the exception to this rule allows suits against state officials for the purpose of enjoining the enforcement of an unconstitutional state statute. This exception rests on the fiction of *Ex parte Young*—that because a sovereign state cannot commit an unconstitutional act, a state official enforcing an unconstitutional act is not acting for the sovereign state and therefore is not protected by the Eleventh Amendment.

*Okpalobi v. Foster*, 244 F.3d 405, 411 (5th Cir. 2001) (citation omitted).

The fiction of *Ex parte Young* creates an imaginary distinction between the state and its officers. But the exception applies only in equity and only where a plaintiff seeks "prospective relief against a state employee acting in his official capacity." *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 321 (5th Cir. 2008). Moreover, it is not enough that a plaintiff seeks prospective relief against a state actor in his official capacity:

> For a plaintiff to properly invoke *Ex parte Young*, the state official sued must have some connection with the enforcement of the challenged act, or else the suit is merely making him a party as a representative of the state, and thereby attempting to make the state a party. In other words, there are plenty of state actors. A plaintiff must show that the defendant state actors have the requisite connection to the statutory scheme to remove the Eleventh Amendment barrier to suits brought in federal court against the State.

*Haverkamp v. Linthicum*, 6 F.4th 662, 669 (5th Cir. 2021) (cleaned up).

"To show this required 'connection,' a state officer must have a 'particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023) (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 181 (5th Cir. 2020)). "'Enforcement' for *Young* purposes means [that the official in question employs] 'compulsion or constraint'" in enforcing the law at issue. *Richardson v. Flores*, 28 F.4th 649, 655

(5th Cir. 2022) (quoting *City of Austin v. Paxton*, 943 F.3d 993, 1000 (5th Cir. 2019)), *cert. denied sub nom. Weisfeld v. Scott*, 143 S. Ct. 773 (2023).

"[T]here is significant overlap between standing and *Ex parte Young*'s applicability." *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 513–14 (5th Cir. 2017). TAMU argues that PETA "lacks standing as it did not plausibly allege that [its president] (1) was involved in the May 2020 deletion incident or (2) had the particular duty to enforce TAMU's social media[] policy." Dkt. 43 at 19. In response, PETA argues that TAMU's President "has authority over all TAMU policies and practices," Dkt. 48 at 15 (quoting Dkt. 39 at 2), and that President Young "settled the previous lawsuit on the same issue before this Court." *Id.* at 17.

PETA does not point me to any statute conferring upon TAMU's President the *particular* duty to enforce TAMU's social media policies. In fact, PETA does not point me to *any* State source of authority for TAMU's President whatsoever. The only statute to which PETA cites is the federal statute under which it brings this suit. Nevertheless, because this is a motion to dismiss, I will treat as true PETA's conclusory allegation that TAMU's President has general or university authority. This is still not enough. It is well entrenched that "[a] general duty to enforce the law is insufficient for *Ex parte Young*." *Tex. Democratic Party*, 978 F.3d at 181. PETA's authorities on this point are either out-of-circuit cases with no binding authority, or inapposite.

For example, PETA states that in *Nelson* the Fifth Circuit found "jurisdiction under *Young* over [a] lawsuit against [the] university president alleged to be the 'administrative head' of the university." Dkt. 48 at 16 (citing *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 319 (5th Cir. 2008)). But *Nelson* rested on a long line of cases in which the Fifth Circuit "treated *Ex parte Young* as an appropriate vehicle for pursuing reinstatement to a previous job position." *Nelson*, 535 F.3d at 322. A university employee suing for job reinstatement is not analogous to a non-profit organization suing for a free speech violation.

7

Nor is *Whole Woman's Health v. Jackson* on point. In that case, the Supreme Court held that pursuant to *Ex parte Young*, abortion providers could bring a pre-enforcement § 1983 action against *only* "executive licensing official[s] who may or must take enforcement actions against the [providers] if they violate the terms of Texas's Health and Safety Code, including S.B. 8." 142 S. Ct. 522, 535 (2021). The Supreme Court's holding turned on the fact that the abortion providers "identified provisions of state law that appear to impose a duty on the licensing-official defendants to bring disciplinary actions against [the providers] if they violate S.B. 8." *Id.* at 537. Here, PETA has identified no statutory provisions that require or even permit TAMU's President to take any action against a TAMU employee who violates TAMU's social media policies.

PETA's reliance on *K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010) is similarly misplaced given PETA's failure to identify any specific statutory duty to enforce TAMU's social media policies. In *K.P.*, the Fifth Circuit found the requisite enforcement connection in a Louisiana statute that required the defendant Board director and its members to consider abortion claims and decide whether to pay them. The Fifth Circuit found that not only did the Board enforce the statute at issue "by applying its prohibitions," but the record also indicated "that the Board took an active role in enforcing [the statute] as to [the defendant physician's patient]." *Id.* at 125. Again, PETA points to no statutory duty and certainly no "demonstrated willingness to exercise that duty.'" *Ostrewich*, 72 F.4th at 100. Thus, even if TAMU's President "has *authority* over all TAMU policies and practices," Dkt. 48 at 15 (emphasis added), that does not mean TAMU's President has a particular *duty* to *enforce* those policies and practices generally, or TAMU's social media policies specifically.

Nor is the settlement agreement that TAMU's President executed with PETA the source of a particular duty. President Young's agreement with PETA that TAMU would not block or filter PETA's comments, or exercise viewpoint discrimination, was merely a promise between litigants. The settlement agreement

8

itself does not confer on TAMU's President "the ability to 'compel or constrain [university] officials' to enforce [TAMU's social media policies]." *Ostrewich*, 72 F.4th at 101. Absent the ability to compel or constrain enforcement, and the demonstrated willingness to do so, this case falls outside *Ex parte Young*'s equitable exception.

## CONCLUSION

For the reasons explained above, I recommend the Motion to Dismiss (Dkt. 43) be **GRANTED**. Specifically, I recommend the district court find that it lacks subject-matter jurisdiction to hear PETA's claims because there is not an enforcement connection between TAMU's President and the alleged constitutional violations.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(c); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 1st day of September 2023.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE